J-A09025-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: A.B., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| IN RE: C.B., A MINOR, | |
| APPEAL OF: J.B., FATHER | |
| | No. 1435 MDA 2016 |

Appeal from the Order Entered August 22, 2016
In the Court of Common Pleas of Huntingdon County
Orphans' Court at No(s): 2016-0005, 2016-0006

BEFORE:  SHOGAN, OTT, and STABILE, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED JUNE 13, 2017**

Appellant, J.B. ("Father"), appeals from the order entered on August 22, 2016, terminating his parental rights to his two minor children A.B. and C.B. (collectively "the Children").[1]  After review, we vacate the order and remand for further proceedings consistent with this memorandum.

---

[1] We note that Father improperly filed a single notice of appeal.  **See** Pa.R.A.P. 341, note (stating, *inter alia*, that where one order resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed).  However, had Father filed separate notices of appeal challenging the termination of his parental rights to each child, the appeals likely would have been consolidated pursuant to Pa.R.A.P. 513.  In light of this consideration and because we discern no impediment to appellate review, we shall proceed to address the merits of Father's appeals in this single memorandum.

The record reflects that J.H. ("Mother") is the biological mother of the Children,[2] and Father is the biological father of the Children.[3] The Children were declared dependent on August 8, 2013, and subsequently placed in protective custody on February 14, 2014. The Children were placed together in their current foster home on October 17, 2014.

The orphans' court provided the following relevant factual background:

> [Huntingdon County Children and Youth Services ("CYS" or "the Agency")] was first introduced to [Mother] after she was charged with leaving two of her children unattended in a vehicle in May of 2013. Thereafter, the Agency continued to receive reports of [Mother] leaving the children unsupervised outside while at home. The children were again removed from [Mother's] home after she left the children unattended in a vehicle for a second time. Throughout the investigation, [Mother] was reluctant to cooperate with the Agency. After being restricted to supervised visits in October of 2014, [Mother] never progressed to unsupervised visits due to the ever present concerns for the safety of the children. Dependency records showed repetitive concerns with [Mother's] parenting abilities and with her ability to maintain a safe environment for the children.

> The dependency orders also show that the Court has had concerns about [Mother's] drug use. *See* October 29, 2014, Permanency Review Order. In September and October of 2014, [Mother]r had three peculiar hospital visits. On one of the trips a dose of Narcan, an opiate antidote, helped alleviate [Mother's] symptoms. On another trip, she tested positive for substances that included methadone and benzodiazepines. On a third

---

[2] J.H. has filed an appeal from the order involuntarily terminating her parental rights at a separate docket number and is not a party to this appeal.

[3] We note that Mother has a third biological child, E.H. Father is not E.H.'s biological Father, and E.H. is not a party in this appeal. However, E.H. lives in placement with the Children.

hospital trip, she left against medical advice. While [Mother] alleges that she suffers from a possible seizure disorder, we are not convinced that drug use was not at least a contributing factor in the hospital visits.

[M]other's mental health condition and her inability to seek consistent treatment has resulted in many of the incidents. She has been diagnosed with anxiety and depression on Axis I, as well as a personality disorder on Axis II. She is not currently seeking treatment for those mental diagnoses. On her own volition, she stopped taking her prescribed medications in 2014. She has asserted that she does not believe in medication.[3] The testimony of Dr. Chiswick, a licensed psychologist who conducted an evaluation of [Mother], unequivocally shows that the children have been at risk for serious injury due to the conduct of [Mother]. Dr. Chiswick testified that [Mother] lies about important issues, she is dependent on substances, and she cannot provide a safe environment for the children. The concerns for the safety of the children, [Mother's] mental health issues and [Mother's] dependence on substances have been repetitive. The [A]gency has provided services, parenting classes and mental health counseling, but [Mother] has made minimal, if any, progress toward becoming a suitable caretaker for the children.

> [3] Dr. Chiswick testified that [Mother] said, "I do not believe in doctors and medicine. I just believe in God and prayer. Medication kills you. And so long as I have my family, I will be fine." N.T. 4/11/16, p. 42.

Since the children were removed from the home in 2014, [Mother] has not progressed past weekly supervised visitation. Even though [Mother] has undergone mental health treatment in the past, she testified that she currently is not seeking mental health treatment. [M]other has repeatedly proven that she is incapable of performing her parental duties and has failed to improve since the start of the dependency process.

Unlike [Mother], [Father] may have the mental ability to parent his children, however, he has chosen a passive parental role.[4] He has always relied on others to raise his children, and when he was given the opportunity to parent by the Court, his own recklessness placed the children at risk.

<sup>4</sup> At the inception of the dependency actions in 2013 [Father] was not residing with [Mother] and the children. [Mother] resided with the children in Orbisonia, Huntingdon County and [Father] lived with his father in Six Mile Run, Bedford County which is a distance of more than 20 miles.

It is important to note that, although he is not the father of E.H., [Father] has played a significant role in raising E.H. [Father] stated he has been together with [Mother] for six years "on and off." Additionally, [Mother] indicated that [Father] has been the father figure for E.H.

Dr. Kristen Hennessy, a licensed psychologist and an advanced certified trauma practitioner, has been providing therapy for E.H. since October 1, 2015, and she sees E.H. twice weekly. She paints a picture of a child preoccupied with his safety, and one who suffers from post traumatic stress disorder. The most disturbing testimony from Dr. Hennessey was that "(E.H) has been afraid on multiple levels and has been surprised to hear that adults would do what was necessary to protect a child ...." N.T. 4/11/2016, p. 63. He also has a great fear that … [M]other and [Father] will come and get him. E.H is obsessed with fear, however he now only trusts his foster father to protect him, according to Dr. Hennessey. E.H. is a child who will be in care for a long period of time due to the failures of those charged with the duty to protect him.

[Father] was certainly aware of [Mother's] deficiencies, yet he continued to place the children in the care of [M]other, both before and during the pendency of the dependency proceedings. The conduct of [Mother] is so bizarre and complex that [Father] cannot argue that he was not aware that her conduct was traumatizing the children.

* * *

When the Court was presented with facts regarding [Mother's] conduct, the children were placed with [Father] with the direction to reside at paternal grandfather's house with the children. To put it bluntly, this Court took a chance by allowing [Father] to parent on his own. Individuals at the Agency (including their solicitor) had multiple conversations with [Father] about not allowing contact with [Mother]. Instead, after

the children were removed from [Mother's] care by the Court, they were reunited with her by [Father]. [Father] was well aware of [Mother's] destructive path at this point, and well aware of the Court Order dated February 19, 2014.

Even after the children were exposed to multiple family trips to the emergency room evidencing the bizarre behavior of [M]other in September and October of 2014, [Father] continued to reside in the same house with [Mother] and the children. It was only through [Mother's] medical records that the Agency discovered that [Father], Mother, and the Children] were living together again. [Father] explained his contemptuous and dangerous actions as "bad judgment" and a "mistake." While we agree with his assessment, we cannot allow such potentially horrific mistakes to happen again when it comes to the protection of children.

[Father's] reliability and judgment are questionable in other aspects of his life. He lost his long-time employment due to attendance issues. He has repeatedly failed to take full accountability of the entire dependency situation, and he continues to place blame on others. He testified that he has changed and learned from these incidents, but there is little on the record to suggest that he can parent at a level that will keep the children safe. While he took it upon himself to complete a parenting class, it was only after the Agency filed the Petition to Involuntarily Terminate Parental Rights that he sought to obtain parenting certificates. He had months to show his capabilities as a parent, but instead of taking matters into his own hands, he blamed the Agency for his failures.[5]

[5] The two certificates admitted into evidence are dated February 10 and February 18, 2016, and the petition was filed January 11, 2016. N.T. 4/11/2016, p. 138. [Father's] efforts, after the dependency action was filed, cannot be considered by the Court for Sections 2511 (a)(1) and (a)(8). For the remaining sections, this Court gives minimal weight to the parenting classes.

Orphans' Court Opinion, 8/24/16, at 3-5.

On January 8, 2016, CYS filed petitions to involuntarily terminate Father's parental rights to the Children. The orphans' court held hearings on the petitions in April and May of 2016. On August 12, 2016, the orphans' court entered orders involuntarily terminating Father's parental rights to the Children under 23 Pa.C.S. § 2511(a)(5) and (8). The orphans' court subsequently filed an amended order on August 22, 2016, terminating Father's parental rights to the Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8). This timely appeal followed. Both Father and the orphans' court have complied with Pa.R.A.P. 1925.

On appeal, Father raises the following issues for this Court's consideration:

> 1. Whether the Trial Court erred as a matter of law and/or abused its discretion in determining that the Agency established a legal basis for terminating the parental rights of [Father] pursuant to 23 Pa. C.S. §§ 2511(a)(1), (a)(2), (a)(5), and (a)(8)?
>
> 2. Whether the Trial Court erred as a matter of law and/or abused its discretion by failing to adequately determine the effect of severing the bond between [Father] and the children as required under 23 Pa. C.S. § 2511(b)?

Father's Brief at 5.

Our standard of review in cases of involuntary termination of parental rights is well settled:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if

- 6 -

they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As we discussed in [*In re:*] *R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012) (internal citations omitted). Additionally, the burden is upon the petitioner to prove by clear and convincing evidence the existence of grounds for termination of parental rights. *Id*. at 821.

Moreover, we have explained:

[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation and internal quotation marks omitted).

Father argues that the orphans' court erred in concluding that grounds for termination existed under 23 Pa.C.S. § 2511(a) and that termination would be in the best interest of the Children under 23 Pa.C.S. § 2511(b). The orphans' court analyzed sections 2511(a)(1), (2), (5), (8), and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination.**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to **any one** subsection of section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (emphasis added).

While the orphans' court concluded that the Agency satisfied the requirements of 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8),[4] on review, we focus on 23 Pa.C.S. § 2511(a)(1). "To satisfy the requirements of section

---

[4] Orphans' Court Opinion, 8/24/16, at 3.

2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." ***In re Z.S.W.***, 946 A.2d 726, 730 (Pa. Super. 2008).

> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

***Id***. (citation omitted).

The orphans' court provided the following analysis:

> [T]he Superior Court has noted that although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. *In re E.M.*, 2006 PA Super 248, 908 A.2d 297, 303 (Pa. Super. 2006) (quoting *In re B., N.M.*, 2004 PA Super 311, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005)).
>
> [Father and Mother] have each failed in their parental duties to their children. Both natural parents claim love and affection for the children, but the physical and emotional development of the children has been put at great risk due to an inability to parent from natural mother and the passive parenting role of natural father. …
>
> [Father] has never been the caretaker of these children on his own, and he has never adequately performed his parental duties at any time. At the time the Agency was alerted to danger [to] the children, [Father] was not residing with them. When given the opportunity to parent on his own by this Court,

- 10 -

[Father] placed the children in repeated danger by choosing his relationship with [Mother] over the well-being of the children.

Orphans' Court Opinion, 8/24/16, at 6 (internal quotation marks omitted).

We agree with the orphans' court's assessment. Father's refusal to act as a parent throughout the Children's lives and his decision to put the Children in harms' way by placing them in Mother's care despite being instructed not to illustrate a settled intent to relinquish his parental claims and a refusal or failure to perform his parental duties. *Z.S.W.*, 946 A.2d at 730. Accordingly, we conclude there was no error or abuse of discretion in the orphans' court involuntarily terminating Father's parental rights to the Children pursuant to 23 Pa.C.S. § 2511(a)(1).

Next, we must review Father's challenge to the orphans' court's decision under 23 Pa.C.S. § 2511(b). This Court has explained that the focus in terminating parental rights under section 2511(a) is on the parent, but under section 2511(b) the focus is on the child. *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court stated:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional

bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

The orphans' court discussed the bond Father has with the Children:

> Elizabeth Gotwals, a licensed clinical social worker, who has worked with [Father] since December 2014, testified that "[Father] is fully attached to his children and is really looking for a reciprocity in that relationship to continue." N.T. 5/13/2016, p. 4. She also stated that "[Father] should be given that time to reattach - there's a distance that causes the detachment, for their relationship to normalize as a father and his children." N.T. 5/13/2016, p. 6. Based on this testimony (of [Father's] own expert witness), while [Father] is fully attached to his children, it does not appear that the children are fully bonded with him. The children have been placed in a stable environment with their foster family, and have only seen natural father on a weekly supervised visit. Peggy Nadenichek, who also testified on behalf of natural father, asserted that [Father] and his children had a secure bond. However, the Court must take into consideration that this witness only observed [Father] and his children in one supervised visit. Both experts focused on the father-child relationship from [Father's] perspective. **The record lacks evidence that the children were fully bonded and attached with [Father], and it is hard to believe such a bond could exist based on the failure of [Father] to take on a full-time role in the lives of his children over the course of their lifetimes**.

> While a loving relationship is important, it is just as important that the children live in a stable and safe environment. Counsel for [Father] has done an admirable job in attempting to paint his client as a conscientious father. Superior advocacy has provided a courtroom glimpse of [Father's] potential to be a parent, however, we have to consider the entire record of [Father's] colossal failures to protect his children.

> The Court must terminate parental bonds "which exist in form but not in substance when preservation of the parental bond would consign a child to an indefinite, unhappy, and

unstable future devoid of the irreducible minimum parental care to which that child is entitled." *In re J.W.*, 578 A.2d 952, 958, 396 Pa. Super. 379, 391 (Pa. Super. Ct. 1990). "A parent's basic constitutional right to the custody and rearing of his or her "child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re E., N.M.*, 856 A.2d 847, 856, 2004 PA Super 311, P21 (Pa. Super. Ct. 2004) (citation omitted). We place extreme emphasis on the need for stability and safety in the lives of these children.

The absence of [Father's] parenting skills and his troubling decision-making have remained a constant. "A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parent." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. Ct. 2003). [Father] potentially had the ability to parent, but he has never shown the fortitude to take on that responsibility.

Orphans' Court Opinion, 8/24/16, at 9-10 (internal footnote omitted; emphasis added).

We are constrained to conclude that while the orphans' court reiterates Father's parental failings, it does not provide an analysis with respect to the best interests of the Children and any bond the Children may have with Father.

In performing a "best interests" analysis:

The court should also consider the importance of continuity of relationships to the child, because severing close parental ties is usually extremely painful. The court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. Most importantly, adequate consideration must be given to the needs and welfare of the child.

*In re I.J.*, 972 A.2d 5, 12 (Pa. Super. 2009) (internal citations and quotation marks omitted). Here, the orphans' court made no findings

regarding the effect that terminating Father's parental rights would have on the Children.

Accordingly, we vacate the orphans' court's order granting the involuntary termination of Father's parental rights, and we remand this matter for the parties to provide additional evidence concerning the effects that termination of Father's parental rights would have on the Children. *In re T.F.*, 847 A.2d 738, 745 (Pa. Super. 2004).[5] Following the presentation of this additional evidence, we instruct the orphans' court to conduct an analysis supporting its decision with respect to 23 Pa.C.S. § 2511(b).

Order vacated. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/13/2017

---

[5] On remand, the orphans' court shall appoint counsel to represent the Children. *In re Adoption of L.B.M.*, 84 MAP 2016, ___ A.3d ___ (Pa. 2017) (citing 23 Pa.C.S. § 2313(a)).